# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-1035
Filed May 13, 2026

———————————

**In re the Guardianship of E.W.-W., a Minor,**

**M.W.,**
Appellant.

———————————

Appeal from the Iowa District Court for Mitchell County,
The Honorable Karen Kaufman Salic, Judge.

———————————

**AFFIRMED**

———————————

Joseph Schiller of Iowa Legal Aid, Mason City, attorney for appellant.

Cameron M. Sprecher of Sprecher Law Office, Mason City,
attorney for appellee guardian.

———————————

Considered without oral argument
by Ahlers, P.J., and Buller and Sandy, JJ.
Opinion by Sandy, J.

1

**SANDY, Judge.**

E.W.-W. is approximately eleven years old. In those almost eleven years, she has endured her mother's addictions, survived sexual abuse at the hands of a trusted relative, lost her grandmother and prior caretaker to cancer, and navigated an absent father. But despite those setbacks and hardships, she has finally found in her aunt's home something previously rare and unheard-of: a bedtime, consistent meals, and adults who actively care for her. Her mother—now sober for over four years, employed, and settled in a home with a room set aside for her daughter—wants her back. The question before us is not whether the mother loves her daughter, or whether she has turned her life around. She does and she has. The question is whether, against the backdrop of this child's particular history, the record supports continuing the guardianship over her mother's objection. We conclude it does, and in so doing, affirm.

## BACKGROUND FACTS AND PROCEDURAL HISTORY

E.W.-W. is the mother and father's eleven-year-old daughter. From her birth until approximately 2018 or 2019, E.W.-W. resided with her parents on a shared custody basis. Around that time, the mother developed a dependency on opiates and methamphetamine, which ultimately resulted in criminal charges for theft and unauthorized use of a credit card, a brief period of incarceration, and her inability to care for E.W.-W. As a result, E.W.-W. went to live with her paternal grandparents. While residing there, E.W.-W. was repeatedly sexually abused by her paternal grandfather, a fact unknown to others at the time. He was later found responsible for child abuse by the Iowa Department of Health and Human Services and entered a guilty plea to a felony charge of lascivious acts with a child. A no-contact order was

subsequently entered prohibiting the paternal grandfather from having any contact with E.W.-W.

Following the death of E.W.-W.'s paternal grandmother from cancer around 2021, E.W.-W. went to live with her father in Minnesota. The father worked as an over-the-road truck driver, had a history of substance abuse and domestic violence, and was frequently absent from the home. E.W.-W. was often cared for by the father's significant other. M.F., who is E.W.-W.'s paternal aunt, agreed to assist in caring for E.W.-W. and her half-sibling. The father subsequently relocated to Riceville, Iowa, to facilitate that arrangement.

During this same period, the mother had not maintained contact with E.W.-W. Her opiate dependency had transitioned to methamphetamine abuse. She entered inpatient treatment approximately four years ago. M.F. spoke with both parents about establishing a guardianship. Both consented, and in August of 2022, M.F. was appointed as E.W.-W.'s legal guardian pursuant to Iowa Code section 232D.203 (2022). At the time of her consent, the mother was sober, employed, and in a relationship with her now-spouse. She was, however, residing in a one-bedroom apartment without a designated space for E.W.-W., and E.W.-W. had expressed a preference to remain with M.F.

Following establishment of the guardianship, contact between the mother and E.W.-W. was limited and inconsistent. Visits were infrequent and often requested with minimal advance notice—conflicting with E.W.-W.'s scheduled activities. Eventually the mother purchased a home in Fort Dodge with a designated bedroom for E.W.-W., obtained a degree, and maintained her sobriety and employment.

In August 2024, the mother filed a petition to terminate guardianship. The juvenile court initially declined to schedule a hearing on the petition, noting that the mother did not have physical care or unsupervised visitation with E.W.-W. and directed the mother to notify the court once the custody order with the father was modified. The mother subsequently obtained a modification of the custody order between herself and the father, granting her physical care of E.W.-W., with the father receiving visitation as agreed between the parties (defaulting to every other weekend if the parties could not agree). The mother then moved to reinstate the petition to terminate guardianship in December 2024, and a hearing was scheduled for May 2025.

Following the withdrawal of a previously appointed court visitor, the juvenile court appointed a new court visitor who conducted interviews with E.W.-W., the mother, and M.F., reviewed financial records, and inspected both homes. The court visitor's report found that the mother's home was adequately maintained and appropriate, that the mother had been gainfully employed with the same employer for approximately four years, that the mother had maintained sobriety for more than four years, and that the mother was meeting E.W.-W.'s physical, psychological, and emotional needs. The court visitor recommended termination of the guardianship and that custody be returned to the mother, while also recommending that E.W.-W. be permitted to maintain contact with M.F. and the guardian's family.

At the contested hearing, the court received testimony from the mother, E.W.-W.'s maternal grandmother, and the guardian. Exhibits were admitted into evidence. The father did not appear. E.W.-W. was present at the outset of the hearing and was thereafter excused to return to school. The same day the contested evidentiary hearing occurred—May 22, 2025—the juvenile court entered its order denying the mother's motion for termination

4

of guardianship. The court found that a basis for the guardianship continued to exist, that termination of the guardianship would be harmful to E.W.-W., and that E.W.-W.'s best interests were in the continuation of the guardianship, which outweighed the mother's interests in termination of the same. The mother appeals, arguing that the juvenile court erred when it denied her request to terminate the guardianship.

## STANDARD OF REVIEW

An action for termination of guardianship is a proceeding in equity. *In re Guardianship of L.Y.*, 968 N.W.2d 882, 892 (Iowa 2022). Accordingly, review of an order declining to terminate a guardianship is de novo. *Id*. In equity cases, we give deference to the lower court's factual findings, but we are not bound by those determinations. *Id*.

## DISCUSSION

When a court finds the basis for a guardianship established under Iowa Code section 232D.203 "is not currently satisfied," the court "shall terminate" the guardianship unless the party seeking continuation proves by clear and convincing evidence both that termination would be harmful to the minor and that the minor's interest in continuation outweighs the parent's interest in termination. Iowa Code § 232D.503(2) (2025); *L.Y.*, 968 N.W.2d at 900. To meet the clear and convincing standard under the Iowa Minor Guardianship Proceedings Act in a guardianship-termination proceeding, it is insufficient for the guardians to show that they would provide superior care to the child. *L.Y.*, 968 N.W.2d at 900.

To start, the mother has made commendable and genuine progress. She has maintained sobriety for over four years, obtained stable employment as a substance-use counselor, purchased a home with a designated room for

E.W.-W., and has worked to rebuild their relationship. The court visitor, after reviewing the mother's home and finances and interviewing the parties, recommended termination and found the mother capable of meeting E.W.-W.'s needs. We do not minimize these achievements. But we must also be cognizant that the mother has not fulfilled the role of a parent to E.W.-W. for over seven years—which is likely all of E.W.-W.'s life that she can remember. Such an absence has consequences we cannot overlook. The record—as a whole—supports the juvenile court's conclusions.

E.W.-W. carries diagnoses of PTSD, reactive attachment disorder, and attention-deficit/hyperactivity disorder stemming from a childhood marked by serial neglect, parental abandonment, and repeated sexual abuse by a paternal relative. Her recovery depends fundamentally on stability, predictability, and appropriate boundaries. The juvenile court, in part, had this to say about the mother's ability to provide stability, predictability, and appropriate boundaries:

> Further, there have been many issues with visits. [The mother] and [the mother's spouse] arrive late and drop off late. They also seem to always pick up and drop off [E.W.-W.] as a "team." Certainly, couples generally like to do things together, but [the guardian] had to go pick up [E.W.-W.] from spring break because [the mother] was sick ([the mother's spouse] was not, according to [E.W.-W.]), and some of the inconvenience of working around [E.W.-W.'s] activity schedule could be relieved if one of them could do the transport. Also, when one of their pets needed to go to the vet in the middle of the night, instead of one of them staying with [E.W.-W.] so she could sleep, they woke her up and drug her to Ames, too. [E.W.-W.] reports occasions when she is not eating at regular times or having access to food. She doesn't have a bedtime or any schedule on visits. Even when a child doesn't have school the next day, they need to go to bed at a reasonable hour, and it should be consistent with the usual time and routine so that their sleep is better. There also seems to be a lot of adult napping, including "special naps" (whatever that means). At least once [E.W.-W.] didn't have lunch because [the mother] and [the mother's

6

spouse] took a nap at 1:00 without having fed her and then picked up lunch at 3:30 on the way back to Riceville. This is not healthy for a child. [E.W.-W.] should not be hungry. She should not be left in the dark about when she is going to eat again. Her needs should not be ignored so that both adults in the house can take a nap at the same time, in the middle of the day.

It is also concerning that [the mother] cannot seem to figure out a manageable way to do visits. While certainly it is inconvenient to pick [E.W.-W.] up Friday night, take her to Fort Dodge, bring her back for volleyball on Saturday, take her back to Fort Dodge and bring her back on Sunday, there are other ways to solve this problem. Perhaps not pick her up until Saturday after her game and then spend the night at maternal grandmother's home in Mason City. This would be far less driving and allow [E.W.-W.] to spend time with [her brother] and her grandmother. Instead, [the mother] seems to complain that [E.W.-W.] shouldn't be in volleyball and that visits should not have to work around [E.W.-W.'s] schedule. The visits are supposed to be for [E.W.-W.'s] benefit, so they naturally should work around her needs and her schedule. One of the main features of parenting is that it [is] very inconvenient. Kids need things and parents need to provide them. That often requires accommodating the schedules that organizations set—not limit the child's opportunities nor complain about the time associated with it.

Also, parents have rights, but they also have obligations to their child. [The mother] has not provided financial assistance for seven years (other than being asked once for something related to dance). She has not spoken with [E.W.-W.'s] teachers, therapist, coaches, 4H leader, doctors or dentist. While she complains that [the guardian] has not discussed any of these appointments or activities with her in advance, as the guardian, [the guardian] is not required to do that. It would be nice if she would, but there is no evidence that anything major has happened (other than the sexual abuse) that would warrant some sort of consultation. Even in complaining that she was not consulted about [E.W.-W.] being baptized, it seems that there have been at least two discussions about it, including [the mother's] statement that she was leaving the decision up to [E.W.-W.]. [E.W.-W.] made her decision, she talked with [the mother] about it, and it occurred. [The mother] and [the mother's spouse] did not attend, and if religion isn't their thing, that is understandable. But like the complaint that she hasn't been consulted, it seems more of an irritation that she wasn't asked

permission than an actual concern that [E.W.-W.] is not receiving proper care or attention. Particularly since [the mother] could have actually found out all of this directly from [E.W.-W.'s] providers, teachers, coaches, etc.— as well as from [E.W.-W.] or even asking [the guardian]—this does not seem like genuine concern about [E.W.-W.'s] condition but rather lamenting a lack of control over [E.W.-W.'s] life. This fits into the overall feeling that [the mother] wants [E.W.-W.] to be with her because she wants her, not because she believes it will benefit [E.W.-W.] in some way, and without any regard for how difficult yet another move will be for [E.W.-W.]. For example, when asked about what she would like to see for a transition for her home, she had no plan—just a statement that she would like to have her with her as soon as possible. [E.W.-W.] is a person, not a possession, and she is going to have a lot of really big emotions about another move. She doesn't realize that because she is a child, but losing everything that she has built for the last four years will take an emotional toll on her. Losing the people she has grown to trust and been able to rely on is a significant loss that she will grieve—just like the many caretakers she has already lost during her lifetime. A transition such as that has to be thoughtfully discussed with her therapist, [the guardian] and with [E.W.-W.], and carried out in a way that doesn't harm [E.W.-W.]. Having failed to consider that demonstrates a lack of empathy and concern for [E.W.-W.]. There also does not seem to be any idea about a disciplinary approach with [E.W.-W.], other than talking to her or taking away electronics. Especially since [E.W.-W.] has seen a therapist for several years, it would be important for [the mother] to consult with the therapist for suggestions for discipline and transition, but even though she herself is a substance abuse counselor, this does not seem to have occurred to her. (She has made appointments for medical, dental and therapy with new providers, but has ignored the opportunity to speak with the people meeting those needs for [E.W.-W.] now who would have valuable input.)

The juvenile court found that the mother's conduct during visitations—including failing to provide consistent meals and routines—reflected a pattern that, given E.W.-W.'s specific vulnerabilities, presents more than ordinary parenting imperfections. We defer to those credibility-laden findings. The mother's assurances that she would correct these

8

practices if given full-time custody were weighed by the juvenile court and found insufficient, and we find no basis to disturb that determination.

The record also supports the juvenile court's concern regarding the custody arrangement the mother entered into with Father. That stipulation affords the father default unsupervised visitation with E.W.-W., a child he has not seen in at least four years. This is despite his unresolved history of substance use, domestic violence, and his ties to the individual who sexually abused E.W.-W. The mother's agreement to this arrangement, without apparent appreciation of the risk it poses, bears directly on the consequences that would flow from termination of the guardianship and was a legitimate consideration for the court.

We are not unmindful of E.W.-W.'s expressed preference to live with her mother, nor of the close and loving relationship they share. True, a child's wishes are a relevant consideration, but they are not determinative. *See In re Marriage of Ellerbroek*, 377 N.W.2d 257, 258–59 (Iowa Ct. App. 1985). The juvenile court appropriately observed that E.W.-W.'s perspective, shaped by a nascent and still-developing relationship, does not override the weight of the record.

The mother argues the court improperly relied on her failure to exercise parental responsibilities during the guardianship, financial disparities between the households, transition stress, and her prior substance-use history. We agree these factors, standing alone, may be insufficient to rebut the parental presumption. But our affirmance does not rest on those grounds in isolation. It rests instead on the totality of the record, which reflects that the specific and documented risks to E.W.-W.'s safety and therapeutic recovery—considered in light of her particular history and

diagnoses—satisfy the clear and convincing evidence standard required to continue the guardianship.

**AFFIRMED.**